UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| V. | ) | NO. 3:22-cr-00018 |
| | ) | JUDGE TRAUGER |
| | ) | |
| ANDREW WASHINGTON | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

COMES NOW the United States of America, by and through Mark H. Wildasin, United States Attorney, and Assistant United States Attorney Rachel M. Stephens, and responds to the Defendant's Motion to Suppress ("Motion"). The United States submits police properly detained the defendant to effectuate the arrest of someone in the immediate vicinity of defendant, the frisk of defendant for weapons was supported by reasonable suspicion, and all evidence and statements were legally and constitutionally obtained, therefore the defendant's Motion should be denied.

## FACTS

On December 16, 2021, detectives with the Metropolitan Nashville Police Department (MNPD) sought to serve a probation warrant on an individual named Hurley Brown. Hurley Brown was on probation for selling drugs and had recently been released on federal pre-trial release on a charge of felon in possession of a firearm. Events surrounding Brown's federal charge took place on October 14, 2021 and involved the defendant being in possession of a loaded firearm and drugs. Many of the officers involved in the arrest operation of Hurley Brown on December 16, 2021 were also part of the arrest team when Brown was arrested October 14,

1

2021 and knew Brown had recently been in possession of a firearm and drugs. Detective Petriello conducted surveillance via the Metropolitan Housing Department Authority (MDHA) cameras in James Cayce Homes. MDHA properties have strict rules about who may be present on the properties. They keep what is referred to as a "Trespass Waiver" on file, which allows MNPD on behalf of MNPD to charge non-residents who are not authorized to be on the property with criminal trespass. While Petriello surveilled the MDHA cameras, he located Brown with two other then-unknown individuals. Petriello assembled a team to execute the arrest warrant on Brown, and he briefed the team on the specifics of the operation. Many on the team had learned that the previous night in James Cayce homes, someone was killed in a criminal homicide. Petriello and others involved in the arrest operation drove to James Cayce Homes. The arrest team consisted of three groups of detectives. As a result of of the layout of the buildings in James Cayce homes, detectives planned to approach Brown's location from each of the three potential access areas so that if Brown fled, they would have detectives in place in any direction he could flee.

While the arrest team was en route to James Cayce Homes, Detective Straub continued to monitor the cameras and relayed information to the detectives on the arrest team. Once the detectives were in the correct location to execute the arrest operation, regarding the location of Brown, Straub reported to the detectives on the arrest team over police radios "Yeah, they're still standing on the bottom step facing the building. He's got two little buddies there with him. Looks like they're just smoking a blunt."[1] A blunt is an emptied- out cigar wrapper filled with marijuana. The two individuals with Brown were subsequently identified as the defendant

---

[1] Detective Petriello body camera footage at 2:02-2:13.

Andrew Washington and co-defendant Dontre Woodruff. Approximately one hour passed between the time Petriello initially located Brown on the MDHA cameras and the time the arrest team arrived to execute the arrest warrant.

Less than a minute after receiving confirmation of the whereabouts of the trio, detectives began to move in to arrest Brown. Brown saw police coming, and Brown, the defendant, and Woodruff began to walk away. Petriello yelled, "Hurley on the ground!"[2] Others accompanying Petriello also yelled for Brown to get on the ground. As the three were moving away from approaching detectives, Petriello observed the Dontre Woodruff reach for his waistband. When he observed the Woodruff reach for his waistband, Petriello relayed to other detectives, "He's got a gun!"[3] Brown, Woodruff, and the defendant all headed around the corner of the building where they were observed as police moved to arrest Brown. As Woodruff rounded the corner, multiple detectives observed him reach for his waistband. Woodruff slipped and fell on the ground where he lay down and he was immediately detained. Brown was arrested and the defendant detained in the seconds following.

Following the detention of defendant, Detective Kelly observed what appeared to be a gun in the defendant's pocket. Kelly asked the defendant if he had anything on him. The defendant stated, "Yeah, I got something on me." When Kelly asked if it was a gun, defendant responded, "Yeah."[4] Kelly then removed a fully loaded revolver from the defendant's pants pocket. As a detective finished searching the defendant, he told the detective, "I ain't got s***

---

[2] Detective Petriello body camera footage at 2:57.
[3] Detective Petriello body camera footage at 3:01.
[4] Sopher body camera footage at 2:57.

else on me."[5] Approximately one minute later, when detective Sopher is assisting the defendant obtain a lighter for his cigarette, the defendant made several unsolicited statements regarding his circumstances. He told Sopher, "I know I'm gone," "I'm on bond," "I know I'm going to the feds," "when I get out I'm going to keep carrying the mother******," "y'all always gonna get me with a gun on me," among other statements.[6]

Following confirmation of the defendant's identity and his status as a convicted felon, his detention turned into an arrest, and the defendant was read his rights pursuant to *Miranda*.[7] Prior to the defendant's transportation to booking, detective Ruiz briefly spoke with him. Prior to speaking with the defendant, Ruiz confirmed that the defendant had received and understood his rights.[8] During that post-*Miranda* conversation, the defendant confirmed that he was trying to protect himself because two of his "charge partners" were dead, that he got the gun because someone threw it and he picked it up and kept it, that "they didn't get nothing but a gun off me," and "I had a gun on me, man. I'll take my charge. I had a gun on me," among other statements.[9]

**LEGAL ARGUMENT**

   I.   **Police Were Authorized to Detain Washington.**

The Fourth Amendment does not allow for individuals to be subjected to unreasonable searches and seizures. *See Terry v. Ohio*, 391 U.S. 1 (1968). "What the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Id.* citing *Elkins v. United States*, 364 U.S. 206, 222 (1960).

---

[5] Sopher body camera footage at 4:58.
[6] Sopher body camera footage at 6:08.
[7] Sopher body camera footage at 15:22.
[8] Ruiz body camera footage at 31:34.
[9] Ruiz body camera footage at 31:34-32:53.

4

One type of seizure found to be reasonable is the temporary detention of those people present on the scene of an arrest. *Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) (citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981)). In those circumstances, "police have the limited authority to briefly detain those on the scene, even wholly innocent bystanders," in order to secure the scene as they execute an arrest warrant or a search warrant, even absent particularized suspicion. *Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011) (citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981)); *Cherrington*, 344 F.3d at 638 (citing *Summers*, 452 U.S. at 705). Such authorization inherently includes authority to use reasonable force to effectuate the detention. *See Muehler v. Mena*, 125 S. Ct. 1465, 1470 (2005) (finding the use of handcuffs was reasonable). Detention of individuals present at the scene of an arrest prevents flight, minimizes the risk of harm to officers and others, and facilitates the orderly completion of police business. *Burchett v. Kiefer*, 310 F.3d 937, 943 (6th Cir. 2002).

Police were authorized to detain the defendant in this situation. They were arresting an individual known to have recently been in possession of a firearm and drugs. Washington and Woodruff were in the immediate vicinity of Brown and walked away with Brown from the officers approaching and instructing Brown to get on the ground. As the three rounded a corner and were met with additional officers, Brown was arrested and the defendant and Woodruff detained. This detention allowed officers on the scene to effect the arrest of Brown, to prevent flight, and to minimize the risk to officers and others. *See id*.

II. **The Frisk of Washington was Supported by Reasonable Suspicion.**

Following the lawful detention of the defendant, the issue becomes whether officers had developed reasonable suspicion that the defendant was armed and dangerous, warranting a frisk

5

pursuant to *Terry v. Ohio*. 392 U.S. 1, 30 (1968); *Arizona v. Johnson*, 129 S. Ct. 781, 783 (2009). Police may conduct a cursory search for weapons following a lawful detention where a police officer observes conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous. *Terry*, 392 U.S. at 30; *United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) (quoting *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016)). The purpose of such a limited search under circumstances providing the belief to officers that the person in close proximity is armed and dangerous is "not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)).

Reasonable suspicion is not a high bar. *United States v. Sheckles*, 996 F.3d 330, 343 (6th Cir. 2021). In fact, the amount of suspicion required is quite low. *McCallister*, 39 F. 4th at 373. The reasonable suspicion test turns on the same totality of circumstances that governs probable cause, but it requires less than the "probability or substantial chance of criminal activity" that is necessary for probable cause. *United States v. Sheckles*, 996 F.3d 330, 343 (6th Cir. 2021) (internal citations omitted)).

The reasonable suspicion analysis is one to be conducted considering the totality of circumstances. *Id.* The totality of circumstances includes "'commonsense judgments and inferences about human behavior… as well as inferences the officer may draw based on his 'experience and specialized training.'" *McCallister*, 39 F.4th at 374 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 120 (2000) and *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

6

Here, the temporary detention of the defendant was lawful. Police, who were arresting Brown on an outstanding warrant, encountered and had to account for Brown's associates, defendant and Woodruff, who were in the same immediate space. As the detention was lawful, the analysis shifts to whether law enforcement developed reasonable suspicion that the defendant was armed and dangerous, thereby authorizing a search of his person.

It is clear law enforcement had reasonable suspicion defendant was armed. First and foremost, he told them he was. Within minutes after his detention, Detective Kelly approached defendant who was handcuffed and standing with Detective Sopher. Kelly observed what appeared to be the outline of a gun in defendant's pocket. Kelly asked defendant if he had anything on him, and defendant answered affirmatively, telling Kelly where it was, and confirming it was a gun. Based on these events, law enforcement had reason to believe the defendant was armed.

The analysis then turns to whether law enforcement had reason to believe defendant was dangerous. Under the totality of circumstances available to officers at the time Washington was frisked, officers had reasonable suspicion to believe defendant was dangerous. Police were in an area of high criminal activity where a homicide had occurred the night before. And while a high crime area alone is not sufficient for officers to stop an individual, "police officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicions to warrant further investigation." *Illinios v. Wardlow,* 528 U.S. 119, 123 (2000). The location of a high crime area is properly included in the totality of circumstances analysis. *See United States v. Pearce*, 531 F.3d 374, 382 (6th Cir. 2008); *United States v. McCallister*, 39 F.4th at 371. Police observed defendant in the presence of Brown, where the

group had been for approximately an hour. The defendant was not a passerby or merely present in the same area as Brown, he was an associate of Brown with whom he had spent approximately an hour that morning. Brown was a known drug dealer on probation for selling drugs and recently having been released on federal pre-trial release for possession of a firearm, the circumstances of which also involved drugs. Detectives were not "obliged to ignore the fact that" defendant was "in the company of a man known to be potentially armed and dangerous in assessing the potential risk posed" by the defendant himself. *See United States v. Bell*, 762 F.2d 495, 501 (6th Cir. 1985). The group of three appeared to be smoking marijuana. The group walked away from law enforcement and one of the three was believed to have a firearm based on his reaching for his waistband, a fact conveyed to all police involved in the Brown arrest operation. Washington then confirmed to police he was armed as well. Any reasonably prudent officer, dealing with these fast-evolving circumstances of the arrest operation of Brown, a known drug dealer recently known to have been in possession of a firearm, would be warranted in the belief that defendant, an associate of Brown, who confirmed to officers that he had a gun on his person just feet away from the scene of the arrest, represented a danger.

This is not a case of the defendant being frisked solely because he walked away from approaching police, as suggested by the defendant in his comparison to the situation in *United States v. Patterson.* 340 F.3d 368 (6th Cir. 2003); (Doc. 45, Page ID #: 113.) The analysis in this case begins with a lawful detention for police to effectuate the arrest of one in the immediate vicinity of Brown, the arrestee. The totality of circumstances surrounding that lawful detention then gave these experienced officers reasonable suspicion that Washington was armed. Detective Kelly could see the outline of the gun and the defendant told the detective he was

8

armed. Detectives can also articulate why they believed the defendant was potentially dangerous. Detectives were in a known high-crime area of Nashville where they knew a homicide occurred the night before. Police had identified Hurley Brown, an individual known to them to carry guns and sell drugs, standing with two others, and the group appeared to be smoking marijuana. They knew that Brown was a warrant for violating his probation.

At the moment police began their operation to arrest Brown, Brown was the sole target of police activity, despite police having reasonable suspicion to investigate potential trespassing and possession of marijuana. As soon as Brown saw the detectives beginning to walk in his direction, all three began to walk away. Seconds later, Woodruff, while appearing to avoid contact with police because he walked and then ran away, reached for his waistband. When Petriello saw Woodruff reach for his waistband, he yelled to the officers "he's got a gun!" Multiple other officers also saw Woodruff reach for his waistband as he ran from police.

In this case, officers had an objectively reasonable suspicion that their safety was in danger. Therefore, the frisk of defendant was legitimate. It would have been dangerous and illogical for the police, who lawfully detained defendant and confirmed he had a firearm, to then allow that firearm to remain in the possession of the defendant under these circumstances.

### III. No Statements of Defendant Should Be Suppressed.

Under *Miranda,* a defendant must be given warnings about the exercise of his Constitutional rights whenever he is subjected to a "custodial interrogation." *Miranda v. Arizona,* 384 U.S. 436, 444 (1966). Any questioning that occurs after a defendant's liberty has been significantly restrained triggers the duty to administer those warnings. *Id.* The duty arises whenever there is "express questioning or its functional equivalent." *Tolliver v. Sheets*, 594 F.3d

9

Case 3:22-cr-00018    Document 51    Filed 08/12/22    Page 9 of 12 PageID #: 131

900, 917 (6th Cir. 2010) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 300-01 (1980). "Interrogation" includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 600-01 (1990)). A question asked attendant to custody or arrest is not interrogation requiring the administration of *Miranda* warnings. *United States v. Woods*, 711 F.3d 737, 741 (6th Cir. 2013).

Where a defendant makes a voluntary statement without being questioned or pressured by an interrogator, the statements are admissible despite the absence of *Miranda* warnings. *See Miranda,* 384 U.S. at 478; *United States v. Montano,* 613 F.2d 147, 149 (6th Cir. 1980). More precisely, spontaneous, unprompted statements, despite their potential incriminating nature, need not be excluded at trial. *See Innis*, 446 U.S. at 302-03 (holding there was no "interrogation" where officers engaged in a dialogue "to which no response from the respondent was invited"); *United States v. Chalmers*, 554 F. App'x 440, 447-48 (6th Cir. 2014) (finding that the defendant's motion to suppress was properly denied where his statements arose from him "blurt[ing]" out incriminating statements).

The defendant argues that all statements made by the defendant at the scene should be suppressed as a result of an illegal detention and because they were made in response to questions likely to elicit incriminating responses. (Doc. 45, Page ID #: 114.) The defendant does not cite with specificity which statements by the defendant he claims were made in response to interrogation and contained incriminating statements. Therefore, the United States cannot properly respond.

However, the United States submits that as the detention, frisk, and arrest in this situation were constitutional, all statements of the defendant subsequent to receipt of his *Miranda* warnings were properly obtained and are admissible. Additional statements were related to the administrative concerns of the police as they worked to determine the defendant's identity and whether his detention would become an arrest and fall under the "booking exception" to the *Miranda* requirement. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 423 (6th Cir. 2008) (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). Finally, the defendant's unsolicited and impromptu pre-*Miranda* statements, captured on body camera[10], despite their incriminating nature, are all admissible because they were not made in response to interrogation or the functional equivalent.

## CONCLUSION

Detectives were authorized to detain the defendant who was in the immediate vicinity of an arrest operation. Thereafter, based on the totality of circumstances, detectives had reasonable suspicion the defendant armed and potentially dangerous. The initial detention and subsequent search and arrest of the defendant were reasonable and constitutional. Any statements made by the defendant are properly admissible as either unsolicited statements made not in response to interrogation or following administration of *Miranda* warnings. Accordingly, the United States respectfully requests the Court deny the defendant's Motion in its entirety.

---

[10] Sopher Body Camera at 6:08.

Respectfully Submitted,

MARK H. WILDASIN
United States Attorney

By:    */s/ Rachel M. Stephens*
RACHEL M. STEPHENS
Assistant United States Attorney
719 Church Street, Suite 3300
Nashville, TN 27203
(615) 401-6655
Rachel.Stephens2@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed with the U.S. District Court via CM/ECF, which will send Notice of Electronic Filing to Dumaka Shabazz, attorney for the defendant, on the 12th day of August, 2022.

*/s/ Rachel M. Stephens*
Rachel M. Stephens